Dora Sohland, Defendant below, Appellant,

*vs.*

Mathias H. Baker, Complainant below, Appellee.

Alfred Sohland, Defendant below, Appellant,

*vs.*

Mathias H. Baker, Complainant below, Appellee.

*Supreme Court, on Appeal, Nov. 17, 1927.*

PENNEWILL, C. J., and RICE, HARRINGTON, RICHARDS and RODNEY, J. J., sitting.

*Robert H. Richards* and *Aaron Finger*, for appeallants.

*Caleb S. Layton* and *James R. Morford*, of the firm of Marvel, Layton and Morford, for appellee.

HARRINGTON, J., delivering the opinion of the Court:

The complainant, a stockholder in the Bankers Mortgage Company, sought in the court below to enforce certain alleged corporate rights of that company against the appellants, Alfred Sohland and Dora Sohland. The bill filed made the Sohlands and the Bankers Mortgage Company parties defendant.

The right of the complainant to file his bill having been challenged, that question will be considered first. As a general rule, a cause of action belonging to a corporation can be asserted only by such corporation by a suit in the corporate name. Conditions may, however, exist in a court of equity whereby a stockholder may sue in his own name for the purpose of enforcing corporate rights, though the corporation in question is nominally a party defendant. This is true in a proper case if the corporation on the demand of the stockholder refuses to bring suit.

It is, also, true without any demand on the corporation if the circumstances are such that the directors, whether by reason of hostile interest, or guilty participation in the wrongs complained of, cannot be expected to institute a corporate suit, or where even if they did institute such a suit, it is apparent that they would not be the proper persons to conduct the litigation incident thereto.

As was said by the Chancellor in the court below these are familiar principles in equity and are well recognized in this State. *Ellis v. Penn Beef Co.*, 9 *Del. Ch.* 213, 80 *A.* 666; *Roberts, et al., v. Kennedy, et al.*, 13 *Del. Ch.* 133, 116 *A.* 253; *Harden v. Eastern States Public Service Co.*, 14 *Del. Ch.* 156, 122 *A.* 705; *Fleer v. Frank H. Fleer Corp.*, 14 *Del. Ch.* 277, 125 *A.* 411.

The appellants do not deny that the cause of action relied on by the complaining stockholder comes within the classes of cases that will be considered by a court of equity under such a bill. They claim, however, that the action in this case was in fact instituted by the corporation, and that the use of the name of Baker, as a complainant, was merely through collusion between him and the corporate board of the Bankers Mortgage Company, and, therefore, improper, and unwarranted by anv rule of equity procedure.

In discussing the right of a stockholder to file a bill of this nature, the court in *Corbus v. Gold Mining Co..* 187 *U. S.* 455, 463, 23 *S. Ct.* 157, 160 (47 *L. Ed.* 256) among other things said:

"The directors [of a corporation] represent all the stockholders and are presumed to act honestly and according to their best judgment for the interest of all. Their judgment as to any matter lawfully confined to their discretion may not be lightly challenged by any stockholder or at his instance submitted

for review to a court of equity. * * * And a court of equity may not be called upon at the appeal of any single stockholder to compel the directors or the corporation to enforce every right which it may possess, irrespective of other considerations. It is not a trifling thing for a stockholder to attempt to coerce the directors of a corporation to an act which their judgment does not approve, or to substitute his judgment for theirs."

The right of a stockholder to file a bill to litigate corporate rights is, therefore, solely for the purpose of preventing injustice, where it is apparent that material corporate rights would not otherwise be protected. *Pomeroy's Equity Jurisprudence, vol. 3,* § 1095. But whether such right exists necessarily depends upon the facts of each particular case. *Corbus v. Gold Mining Co.,* 187 *U. S.* 455, 23 *S. Ct.* 157, 47 *L. E.* 256.

In order, however, for a stockholder to supersede the directors in their right to determine whether a corporation shall bring suit in a particular case, the Supreme Court of the United States, in the leading case of *Hawes v. Oakland,* 104 *U. S.* 450, 460, 26 *L. Ed.* 827, said:

"But, in addition to the existence of grievances which call for this kind of relief, it is equally important that before the shareholder is permitted in his own name, to institute and conduct a litigation which usually belongs to the corporation, he should show, to the satisfaction of the court, that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the court."

*Corbus v. Gold Mining Co.,* 187 *U. S.* 455, 23 *S. Ct.* 157, 47 *L. Ed.* 256, is to the same effect.

This, however, does not dispose of the question before us.

It appears that a great majority of the board of the Bankers Mortgage Company, at the time the bill was filed in the court below, had participated in the transaction between the Harrisburg Corporationn and that company. Whether, therefore, they could be expected to institute a suit to inquire into this transaction, or even if they did whether they would be the proper persons to manage and conduct it, may be seriously questioned. But, however that may be, the record shows that before the bill was filed

in the court below, the complainant made a demand upon the directors to take corporate action against the Sohlands for the purpose of bringing about a cancellation of the stock in controversy. It, also, shows that this request was refused and that the complainant was notified to that effect before he filed his bill.

It is true that it appears that a resolution was passed by the board of directors of the Bankers Mortgage Company directing the payment of a retaining fee to the solicitors who subsequently filed the bill for the complainant, and that Mr. Miller, who was then a director and secretary of the company, went to Wilmington with the complainant when he executed the bill filed, and directed him to the office of the solicitors in question.

While the conclusion may be drawn that the corporate management was not hostile to action by the complainant, the fact, nevertheless, remains that the corporation itself refused to litigate an apparent corporate right.

The reasons for such refusal need not be considered. The corporation, having refused to institute proceedings, the only way that its rights could be brought before the court was by a bill filed by a stockholder. That the complainant, for the prevention of injustice, therefore, had the right to file the bill in the court below, seems clear.

The *Constitution of* 1897 (*Article* IV, § 12), in part provides:

"The Supreme Court shall have jurisdiction as follows: * * * To receive appeals from the Court of Chancery, and to determine finally all matters of appeal in the interlocutory or final decrees and proceedings in Chancery."

This case is before this court on appeal under the provision of the Constitution above quoted.

The conclusions of the Chancellor, with respect to the facts, appear in the statement of the case immediately preceding this opinion and it is not necessary to repeat them here.

With respect to such findings, the appellants do not deny that Sohland was the president of both the Harrisburg Corporation and the Bankers Mortgage Company, when the note of the Harrisburg Corporation was executed and delivered and the stock

of the Bankers Mortgage Company was issued, or that such note, standing alone, and without the collateral thereto attached was worthless.

They deny, however, that the evidence justified the conclusion that Sohland dominated the corporate control of both companies; that the note of the Harrisburg Coporation was the consideration for the issuance of the stock in controversy, or, if it was that the stock of the Harrisburg Foundry & Machine Works was practically valueless for collateral purposes at the time the stock of the Bankers Mortgage Company was issued.

They further contend that this case being before this court on appeal, and not on writ of error, that it is its duty to review the evidence and to decide whether it justifies the conclusions, with respect to the facts, reached by the Chancellor. An appeal, generally speaking, is a rehearing by a superior court on both fact and law. It is a process of civil law origin and the usual and appropriate mode of review for causes originating in a court of equity. 2 *Daniell's Chan. Pl. & Pr.*, (*5th Ed.*) 1459; 2 *Ency. of Pl. & Pr.* 31; 2 *R. C. L.* 27; *Nashville Ry. & Light Co. v Bunn*, (*C. C. A.*) 168 *F.* 862; *Cunningham v Neagle*, 135 *U. S.* 1, 10 *S. Ct.* 658, 34 *L. Ed.* 55; *Lewis v. Sittle*, 7 *Ind. T.* 602, 104 *S. W.* 850.

The distinction between an appeal and a writ of error was aptly stated in *Nashville Ry. & Light Co. v. Bunn*, (*C. C. A.*) 168 *F.* 862, where the court said:

"Aside from a rehearing allowed by the Chancellor in his discretion, and the ancient practice under bill of review, there is but one method of revising the judgments and decrees of a court of equity, and that is by an appeal. An appeal is itself a rehearing by a superior court upon fact and law. 2 *Daniell's Chan. Pleading & Pr.*, (*5th Ed.*) 1459. The distinction between a writ of error, which brings up the record in an action at law for a review of questions of law only, and an appeal, which involves a rehearing upon both the facts and law, is vital. These remedies have their origin and functions in the inherent difference between courts of law and courts of equity. * * * The writ of error is a common-law writ, and searches the record for errors of law in the final judgment of a common-law court. If error is found, the judgment awards a *venire facias de novo*. *Parsons v. Bedford*, 3 *Pet.* 446, 448, 7 *L. Ed.* 732. The appeal is a procedure which comes to us from the civil law along with the fundamentals which go to make up the jurisprudence of a court of equity. Its office is to remove the entire cause, and it subjects the transcript to a scrutiny of fact and law, and is, in substance, a new trial."

In an appeal from the Court of Chancery, while this court, in considering the evidence is confined to the record, the case is before us on both law and fact.

It is true in *Chalfant v. Reinhardt, Attorney General*, 12 *Del. Ch.* 389, 113 *A.* 674, it was said:

"This court ordinarily will not disturb a finding on the facts in a hearing before the Chancellor if it appears from the record that there was evidence to support his finding."

The appellants point out, however, that the evidence in that case, pursuant to a recent rule, was heard by the Chancellor in open court; while conceding that under such circumstance, where such evidence was conflicting, there might be a presumption in favor of the correctness of the Chancellor's findings, they contend that the rule announced in the *Reinhardt Case* can have no application here because the evidence was heard on depositions and before an examiner. The evidence was not heard by the Chancellor and he was therefore in no better position to judge as to the credit to be given to the witnesses, and to draw conclusions as to the effect of the testimony than this court is. That being true, *Chalfant v. Reinhardt* has no application to this case and this court is bound to review the evidence and draw its own conclusions with respect thereto without any presumptions in its favor. *Old Dominion Copper Co. v. Bigelow*, 203 *Mass.* 159, 89 *N. E.* 193, 40 *L. R. A.* (*N. S.*) 314; *Dickinson v. Todd*, 172 *Mass.* 183, 51 *N. E.* 976; *Harvey-Watts Co. v. Worcester Umbrella Co.*, 193 *Mass.* 138, 78 *N. E.* 886. See, also, 2 *R. C. L.* 203.

The correctness of this conclusion is not seriously controverted by the appellees. While they rely on *Chalfant v. Reinhardt* in support of the findings of the Chancellor, they contend that the same conclusions will be reached by this court if the evidence be fully reviewed.

On its face, the resolution of the Bankers Mortgage Company on June 16th, 1922, contemplated a loan of $125,000 by that company to the Harrisburg Corporation, with the stock of the Harrisburg Foundry & Machine Works deposited as collateral; the loan to be made as soon as the Bankers Mortgage Company should be in funds. This plan was, however, changed by the resolution

of August 2nd, 1922, which clearly contemplated the issuance of stock of the Bankers Mortgage Company in consideration for the note of the Harrisburg Corporation with the Harrisburg Foundry & Machine Works' stock attached as collateral.

In addition to the resolution itself, this is shown by the statement of Sohland, at the meeting in question. Referring to the resolution of that date, he said: "I want to buy $125,000 of Bankers Mortgage Company stock, and this is the way I want to pay for it."

The record shows that Sohland admitted that he made a statement substantially in this language.

The Chancellor was, therefore, correct in concluding that the record showed that the consideration for the stock, now standing in the name of Alfred Sohland and Dora Sohland, was the note of the Harrisburg Corporation, with the stock of the Harrisburg Foundry & Machine Works attached as collateral.

Unless prohibited by its charter, or some constitutional or legislative provision, a good and collectible note of a subscriber, as well as that of a third person, would be a good consideration for the issuance of stock in a corporation. 14 *Corpus Juris*, 439; *McCarthy v. Texas Loan & Guaranty Co., (Tex. Civ. App.)* 142 *S. W.* 96; 1 *Cook on Corporations, (6th Ed.) note* 3, *p.* 109; *Fletcher on Corporations, vol.* 5, § 3512.

One of the questions before us is what consideration is necessary for the issuance of stock in a Delaware corporation under the *Constitution of* 1897. *Article* IX, § 3, of that Constitution, provides:

"No corporation shall issue stock, except for money paid, labor done, or personal property, or real estate or leases thereof actually acquired by such corporation."

In *Cooney v. Arlington Hotel Co.,* 11 *Del. Ch.* 430, 101 *A.* 879, this court, in construing this provision of the Constitution, held that labor to be done was not "labor done" and was not a good consideration for the issuance of stock in a Delaware corporation. *Scully v. Automobile Finance Co.,* 12 *Del. Ch.* 174, 109 *A.* 49, is to the same effect.

In *Cahall v. Lofland, et al.*, 12 *Del. Ch.* 299, 114 *A.* 224, the Court of Chancery had before it the question, whether unsecured promissory notes of subscribers for stock constituted either "money paid" or "personal property actually acquired," so as to constitute a valid consideration for the issuance of stock, and the Chancellor held that the stock issued was invalid on both grounds.

The same case was subsequently appealed to this court. *Lofland, et al., v. Cahall, Rec'r.*, 13 *Del. Ch.* 384, 118 *A.* 1.

With respect to the sufficiency of promissory notes of subscribers to support the issuance of corporate stock on the theory that it was "money paid" the Chief Justice, in delivering the opinion of this court, said:

"A promise to pay money does not meet the constitutional requirement. Each of the appellants gave his promissory note payable in the future or on demand, for the par value of the stock issued to him, and even though the maker was solvent and the note good, it was nothing more than a promise to pay. It is so clear that a promise to pay, by note or otherwise, is not payment of money within the meaning of our constitution, it is not necessary to cite authorities in support of the proposition."

This court, however, did not pass on the contention that a promissory note of the subscriber constituted "personal property actually acquired."

The Chief Justice, speaking for the court, said:

"While it may be true, as claimed by the appellee, that a promissory note is not property 'actually acquired,' we are not required to say that in no case can a promissory note be so regarded."

While the decree of the court below was affirmed, it was on other grounds that need not be considered here.

The *Constitution (Article* IX, § 3) seems to contemplate the production of the thing itself, and not the mere promise to produce, to justify the issuance of full paid stock. As we have already stated, such has been the construction placed upon it by this court, with respect to labor done, and money paid; mere promises to perform labor or to pay money not being sufficient.

While the promissory note of a subscriber for stock is a chose in action, and in a broad sense, personal property, it would seem to require a forced and unnatural construction of the section in

question to hold that the mere unsecured promise to pay, of the subscriber for stock, would constitute "personal property actually acquired" in the sense which the word "property" was used in this section of the Constitution.

In *Cahall, Receiver, v. Lofland, et al.*, 12 *Del. Ch.* 299,316, 114 *A.* 224, 233, the Chancellor, in delivering the opinion of that court, holding that stock could not be issued in return for the note of the purchaser, said:

"A promissory note in a broad sense is property; but it is only a promise to pay money and, therefore, is a mere evidence of indebtedness. A promise to pay money is not 'money paid,' and cannot be so taken, and it would be a travesty to say that it is 'property actually acquired' and, therefore, may be taken in payment for shares where there is a [constitutional] prohibition such as there is in Delaware."

In support of his conclusion that the promissory notes involved in that case were not "property actually acquired," the Chancellor relied on *McCarthy v. Texas, etc., Co.*, (*Tex. Civ. App.* 1911) 142 *S. W.* 96.

The Constitution of the State of Texas (*Article* 12, § 6) contains a provision that is almost identical with the constitutional provision involved in this case. It provides:

"No corporation shall issue stock * * * except for money paid, labor done or property actually received."

With respect to this question, the court in the *McCarthy Case* said:

"It is further contended that such notes are 'property actually received' within the meaning of the Constitution. It is true a promissory note is 'property' in one sense of the word, as, for instance, when it is in the hands of a third person. It has frequently been so held; but, as between the original parties to the same, it is but a mere evidence of indebtedness and it would be a strained and unnatural interpretation of the Constitution to hold that it was there used in the sense contended for by appellants. To so hold would be to say that in one breath the organic law expressly refused to accept it as 'money paid,' and in the next breath permitted it under the guise of property, thus convicting the framers of the Constitution of a palpable inconsistency."

We might add that in the *McCarthy Case* the note was not only indorsed by a solvent indorser, but the stock issued was, also, deposited as collateral.

In *Washer v. Smyer*, 109 *Tex.* 403, 211 *S. W.* 986, 4 *A. L. R.* 1320, which was quoted by the Chief Justice in *Lofland, et al., v. Cahall, Receiver*, 13 *Del. Ch.* 384, 118 *A.* 1, 6, the court, also, in part said:

"It is clear, in our opinion, that the note of a stock subscriber accepted by a corporation in payment for the stock issued him is not to be regarded as 'property actually received,' within the meaning of the constitutional provision. In such a transaction the subscriber does not pay anything into the treasury of the corporation. He merely gives the corporation his promise to pay. His indebtedness to the corporation arising from the stock subscription is merely evidenced in a different form. True, it is placed in a negotiable form, but in no actual sense is the liability to the corporation extinguished. It is only differently expressed.

\* \* \*

"The real result is that the subscriber has secured an extension of the time of payment, and the corporation has received but a postponement of its right to demand payment.

"The capital stock of a corporation should represent something other than the mere obligations of its subscribers to pay for their stock.

"Undeniably, in the broad sense a note is property in the hands of the payee. \* \* \* But the framers of the Constitution never intended that property of that nature should constitute the capital of a corporation. The term 'property' was used in this section of the Constitution in no such sense. It means property readily capable of being applied to the debts of the corporation.

\* \* \*

"The integrity of a corporation and the interest of the public demand, however, that the assets of a corporation consist of something more than its stockholders' debts. Its capital cannot be thus constituted, and, therefore, it cannot accept a stock subscriber's note \* \* \* for his stock.

"There is authority opposed to this holding, as there is authority which supports it. But it seems to us no authority is needed to establish it."

This case was affirmed in *General Bonding & Casualty Co. v. Moseley*, (1920) 110 *Tex.* 529, 222 *S. W.* 961.

It would be difficult for us to improve upon the language of the above cases.

*Bank of Commerce v. Goolsby*, 129 *Ark.* 416, 196 *S. W.* 803, which involved a similar constitutional provision, is to the same effect.

While there is a dictum to the contrary in *Ozark Diamond Mines Corporation v. Townes*, 117 *Ark.* 552, 174 *S. W.* 151, it is overruled by this case.

See, also, *Fletcher on Corporations*, vols. 5, 10, 11, § 3513; *German Mercantile Co. v. Wanner*, 25 *N. D.* 479, 142 *N. W.* 463, 52 *L. R. A.* (*N. S.*) 454.

There are cases that may be cited in opposition to this conclusion on the ground that the promissory note of a subscriber, while, in one aspect, a mere promise to pay is, also, a chose in action, and, therefore, personal property. Among these cases are *Schiller Piano Co. v. Hyde*, 39 *S. D.* 74, 162 *N. W.* 937; *Pacific Trust Co. v. Dorsey*, 72 *Cal.* 55, 12 *P.* 49; *Meholin v. Carlson*, 17 *Idaho*, 742, 107 *P.* 755, 134 *Am. St. Rep.* 286; *German Mer. Co. v. Wanner*, 25 *N. D.* 479, 142 *N. W.* 463, 52 *L. R. A.* (*N. S.*) 453.

All these cases involve suits on promissory notes voluntarily given for stock subscriptions, where the makers sought to escape liability on the ground that the corporation had no right to accept their notes in payment of such subscriptions. Other distinguishing features may, also, be pointed out in some of them; but whether any of these features affect the principle for which they are cited, or not, the reasoning of cases of that class does not appeal to us, in view of the plain meaning of other words used in connection with the words "personal property" in the same section of the Constitution.

The appellants do not contend that the note of the Harrisburg Corporation, standing alone, had any value whatever, or even if it had that it would have been a sufficient consideration for the issuance of the Sohland stock.

They contend, however, that the note of the subscriber for stock, accompanied by the deposit of corporate stock of good collateral value, constituted "personal property actually acquired," within the meaning of *Article* IX, § 3, of the *Constitution*.

In support of this contention, they cite *General Bonding & Casualty Co. v. Moseley*, (1920) 110 *Tex.* 529, 222 *S. W.* 961; *Prudential Life Ins. Co. v. Pearson*, (*Tex. Com. App.*) 222 *S. W.* 967; *Harn v. Smith*, 85 *Okl.* 137, 204 *P.* 642; *Clarke v. Lexington Stoveworks*, (*Ky.*) 72 *S. W.* 286, 73 *S. W.* 788.

In *General Bonding & Casualty Co. v. Moseley, supra,* the court in part said:

"A subscriber's note secured by a valid first mortgage upon real estate, accepted by the corporation in payment for stock, cannot be held as other than property in the full sense of the Constitution. The corporation thereby obtained something more than the mere promise of the subscriber to pay. It obtains the right to have the land appropriated to the payment of the note. This is a valuable right, a property right, as fully so as any contract right. * * The right acquired under such mortgages is clearly property. * * * "

In *Prudential Ins. Co. v. Pearson, supra,* the note of the subscriber for stock was secured by a deed of trust covering real estate. In *Harn v. Smith* and *General Bonding, etc., Co. v. Moseley,* the notes were secured by real estate mortgages, and in *Clarke v. Lexington Stoveworks,* the note was secured by an insurance policy having a definite cash loan and surrender value.

In all of the above cases cited by the appellants the courts held that the notes, and the collateral by which they were secured, constituted "property actually received."

In the cases where deeds or mortgages were relied on as collateral it appeared that the corporations were authorized to purchase and hold property of that character.

It is true that the Texas case of *Shield v. Lone Star Life Ins. Co.,* (*Tex. Civ. App.*) 202 *S. W.* 211, held that the note of a subscriber for stock, accompanied by lien notes as collateral security, did not make the consideration "property actually received," within the meaning of the Constitution of that State.

This case was, also, followed in *Prudential Life Ins. Co. v. Pearson,* (*Tex. Civ. App.* 1916) 188 *S. W.* 513.

The decision of the *Pearson Case* was based on the theory that the mere promissory note of the subscriber was neither money paid, nor property actually received, and that as the collateral mortgage was merely an incident to the note, it could have no greater effect.

This case, and other cases like it, were overruled, however, in *General Bonding & Casualty Ins. Co. v. Moseley,* (1920) 110 *Tex.* 529, 222 *S. W.* 961, above referred to, and the principle previously established is no longer law in the State of Texas.

Broadly speaking, the capital of a corporation is the fund

used by it in the conduct of its business and from which its profits, in a great measure at least, are expected to be made. This fund is raised by the issue and sale of its authorized capital stock.

*Section* 3 of *Article* IX was enacted for the protection of both creditors and stockholders; for the purpose of preventing the issuance of stock without any consideration, or upon an insufficient consideration, whereby the actual capital would be much less than the amount represented by the shares issued and sold by the corporation.

The broad language used indicates that the framers of the Constitution intended that the capital of a Delaware corporation should be composed of substantial assets, assets of such character that they could not only be readily subjected to the payment of corporate debts, but would also secure the rights of the stockholders in such capital, whether in case of final distribution or otherwise.

The purpose of the section in question is aptly expressed to the same effect in the Texas cases of *Washer v. Smyer*, 109 *Tex.* 403, 211 *S. W.* 986, 4 *A. L. R.* 1320, and *General Bonding, etc., Co. v. Moseley*, (1920) 110 *Tex.* 529, 222 *S. W.* 961. See, also, *Fletcher on Corporations, vol.* 5, § 3506.

In *Harn v. Smith*, 85 *Okl.* 137, 204 *P.* 642, the court, in considering a similar constitutional provision, said:

"It was not the intent of the framers of our Constitution, * * * to limit the kind of property that might be received in payment for stock; but rather, to require that the actual value of the property so received should equal at least the par value of the stock, and that a corporation might receive real or personal property in payment for its capital stock, provided the property was such as the corporation might lawfully acquire and hold for carrying out the objects and purposes for which it was organized, or in which it was required by statute to invest its funds."

See, also, *Fletcher on Corporations*, § 3506, *vol.* 5.

That a negotiable promissory note of a subscriber for stock secured by the proper collateral, may constitute property actually acquired within the meaning of *Section* 3 of *Article* IX of the *Constitution* of 1897, is shown by the above cases cited by the appellants.

As it was not contended that the $125,000 note of the Harrisburg Corporation standing alone ever had any value whatever,

the only thing acquired by the Bankers Mortgage Company for the issuance of the Sohland stock was the second preferred and common stock of the Harrisburg Foundry & Machine Works deposited as collateral. There is no contention as to the right of the Bankers Mortgage Company to acquire property of this character, so the material question to determine is whether such stock had any collateral value at the time the Sohlands' stock was issued, namely, in August of 1922; such value that it could readily be disposed of to acquire funds for corporate purposes.

While the appellants contend that the Harrisburg Foundry & Machine Works had assets in excess of liabilities and good credit in August of 1922, and that its financial difficulties were wholly due to a subsequent depression in the iron and steel business, no dividends had been paid on either the second preferred or common stock since 1914; Sohland admitted its financial condition was worse in August of 1922 than in May of 1921, and it appears from the record that the financial reports of the corporation showed heavy deficits in both 1921 and 1922.

As a matter of fact, its affairs beginning at least with the year 1921 went from bad to worse, finally culminating in the appointment of a receiver in September of 1923 and in the corporation's being adjudicated a bankrupt in December of the same year. Irrespective of floating debts, the bonded debt of the corporation amounted to $293,000, and the highest offer made the receiver for the plant, subject to mortgages, was $51,000, while the first preferred stock issued, alone, consisted of $100,000.

Various bankers testified that the stock pledged had no collateral value in August of 1922.

There is no evidence whatever that it had any market value at that time from which the Bankers Mortgage Company could have hoped in any manner to realize anything from this stock and Sohland had no reasonable ground to believe that it could.

The contentions of the appellants are almost entirely based on the uncorroborated testimony of Alfred Sohland, and our conclusion is that the Chancellor was correct in holding that the stock in question had no cash value when the stock of the Bankers Mortgage Company was issued. The Harrisburg Foundry & Machine Works stock having no cash value, there was no consideration for

the issuance of the Bankers Mortgage Company's stock to the Sohlands and there was no error in the court below in decreeing that such stock be canceled. *Ellis v. Penn Beef Co.*, 9 *Del. Ch.* 213, 80 *A.* 666.

Having reached this conclusion, it is unnecessary for us to consider the further argument of the appellees that the transaction between the Harrisburg Corporation and the Bankers Mortgage Company, resulting in the issuance of the stock in question to Alfred Sohland and Dora Sohland, was fraudulent as to the stockholders of the Bankers Mortgage Company, and that the stock should, also, be canceled on that ground.

For the reasons above given, the decree of the court below is affirmed.