Bernard KAPLAN, Martin Fox and Warren Opal, trustees, on behalf of the Chase Manhattan Corporation, derivatively, Plaintiffs,

v.

PEAT, MARWICK, MITCHELL & CO., Defendant,

and

The Chase Manhattan Corporation, Nominal Defendant.

Civ. A. No. 7124.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 23, 1987.
Decided: May 12, 1987.

Thomas G. Hughes and Mark D. Sisk, of Hughes and Sisk, Wilmington, Jerome M. Congress (argued), and Virginia A. LoPreto, of Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, Carol A. Broderick, of Greenfield & Chimicles, Haverford, Pa., for plaintiffs.

Allen M. Terrell, Jr. and Kevin G. Abrams, of Richards, Layton & Finger, Wilmington, Victor M. Earle, III (argued), William T. Hegarty, and Allen S. Joslyn, of Cahill, Gordon & Reindel, New York City, for defendant Peat, Marwick, Mitchell & Co.

Robert K. Payson, of Potter Anderson & Corroon, Wilmington, for Chase Manhattan Corp.

## OPINION

JACOBS, Vice-Chancellor.

This stockholder's derivative action was brought on behalf of The Chase Manhattan Corporation and its wholly-owned subsidiary, The Chase Manhattan Bank (collectively "Chase"), against Chase's former accountants, Peat, Marwick, Mitchell & Co. ("PMM"), for damages allegedly sustained as a result of financial dealings in which PMM had acted as Chase's independent auditor. The plaintiffs charge that PMM breached its duty of care and contractual duties owed to Chase by failing to conduct proper audits in the so-called "Drysdale" and "Penn Square" matters in which Chase became involved in 1982. PMM has moved to dismiss the action for failure to comply with Chancery Rule 23.1, and, alternatively, for summary judgment under Chancery Rule 56. This is the decision of the Court, following briefing and oral argument, on PMM's motion.

### I. Relevant Facts

#### A. Background

The plaintiffs' complaint, as twice amended, alleges the following pertinent material: During 1981 and 1982, Chase purchased approximately $212.2 million of energy-related loans through Penn Square Bank ("Penn Square"), a small shopping center bank located in Oklahoma City, Oklahoma. (Second Amended Complaint ("Compl.") ¶ 10). At that point Penn Square was in poor financial shape, and on or about July 5, 1982, federal banking authorities declared it insolvent. Id. As a result, Penn Square was closed and Chase was forced to charge off at least $45 million of loans that it had acquired through Penn Square. (Compl. ¶ 11). PMM had conducted a special test of those loans for Chase. (Compl. ¶ 12). It is alleged that at that time, PMM was also the auditor for Penn Square. Id.

Beginning in February 1982, Chase also entered into transactions with Drysdale Government Securities, Inc. ("Drysdale"), a government securities firm whose main activity was speculating in the purchase and sale of volatile securities and repurchase agreements. (Compl. ¶¶ 14, 15, 16). At that point Drysdale was in fact insolvent, but, nonetheless, had issued a statement disclosing a total subordinated debt and equity, as of February 1, 1982, of $20.8 million. (Compl. ¶ 14). Chase received this statement sometime between February 1

and February 5, 1982. Thereafter Chase commenced doing business with Drysdale, including consummating repurchase and reverse repurchase agreements. (Compl. ¶ 15). On May 17, 1982, Drysdale collapsed, owing Chase $270 million in coupon interest due on government securities transactions. Drysdale refused to pay that and other obligations it owed to Chase, and as a result, Chase allegedly suffered $285 million in damages. (Compl. ¶ 18).

Plaintiffs claim that PMM knew or should have known of Chase's dealings with Drysdale, and that if PMM had conducted proper audits, it would have been able to alert Chase to Drysdale's straitened circumstances, thus enabling Chase to avoid the losses. (Compl. ¶ 19). It is further charged that PMM, as auditor for both Chase and Penn Square, should have detected the deficiencies in the loans acquired by Chase through Penn Square. (Compl. ¶ 20).

### B. *Facts Related to Demand*

With respect to the making of a demand upon Chase's directors, the Second Amended Complaint alleges that:

5. On July 1, 1982, plaintiffs Fox and Opal demanded that the directors of Chase and the Bank institute suit against the officers and employees of the Bank and Chase responsible for the losses sustained by the Bank and Chase arising out of the purchase by the Bank of government securities under repurchase agreements to Drysdale Government Securities, Inc. ("Drysdale"). Upon information and belief, another shareholder of Chase made substantially similar demands, including demands that Chase and the Bank sue defendant Peat Marwick Mitchell & Co. ("Peat"), the former auditor of Chase and the Bank, which demands were rejected.

\* \* \* \* \* \*

8. No demand has been made by plaintiff Kaplan upon the Company's directors to institute litigation or otherwise to seek recovery of its damages from Peat because such a demand would have been futile, as evidenced by the futility of those demands that were made.

The record on this point goes, however, beyond the complaint. In support of its motion for summary judgment, PMM submitted the affidavit of Michael E. Carlson, the Secretary of Chase (the "Carlson Affidavit"). In his affidavit, Mr. Carlson states that in a letter dated July 1, 1982, counsel for a Chase shareholder demanded that legal action be taken against those officers of Chase who were responsible for the Drysdale transactions, as well as against the Chase directors who were in office during that period. (Carlson Aff. ¶ 3). At its July 21, 1982 meeting, Chase's Board of Directors created a Litigation Committee to conduct an independent and disinterested investigation to determine what response should be made to that demand. (Carlson Aff. ¶ 4). The Litigation Committee consisted of three outside directors who were not in office during the Drysdale transactions. (Carlson Aff. ¶¶ 4, 8). On August 18, 1982, Chase's Board charged the Litigation Committee with the additional responsibility of investigating Chase's dealings with Penn Square. (Carlson Aff. ¶ 7). Eventually the Litigation Committee recommended that Chase bring suit against six Chase officers to recover for the Penn Square loss, but that no suit be brought against Chase's directors. (Carlson Aff. ¶ 25).

No demand was ever made upon Chase's Board, by plaintiffs or anyone else, to bring a lawsuit against PMM to recover for the Drysdale losses. (Carlson Aff. ¶ 28). However, on August 20, 1982, a demand was made on behalf of a shareholder, Marjorie Janoff, that Chase institute immediate action against PMM for all losses incurred by Chase as a result of PMM's conduct with respect to the bankruptcy of Penn Square. (Carlson Aff. ¶ 9). On August 27, 1982, Chase informed Ms. Janoff's counsel that her demand would be considered by the Board at its September 15, 1982 meeting. (Carlson Aff. ¶ 11). On September 22, 1982, Chase informed Ms. Janoff's counsel that at that meeting, the Board had referred the matter to senior management to make a recommendation to Chase's audit committee. (Carlson Aff. ¶ 12). Chase

also advised counsel that a Litigation Committee had been created to determine whether Chase should pursue legal action against its directors and officers in connection with the Penn Square transactions. (Carlson Aff. ¶ 13).

To assist it in investigating the Penn Square matters, Chase retained an independent accounting firm to review the work done by PMM. (Carlson Aff. ¶¶ 15, 16). After consultation with counsel (who had reviewed and considered the independent accountants' report), Chase's senior management recommended to Chase's audit committee that no litigation against PMM be pursued. (Carlson Aff. ¶ 16). On February 18, 1983, Mr. Carlson wrote to counsel for Ms. Janoff, advising that:

Chase has carefully considered Ms. Janoff's demand in consultation with counsel and with Messrs. Deloitte, Haskins & Sells, accountants retained by counsel. On the basis of information currently available, Chase declines to sue Peat, Marwick, Mitchell & Co. since Chase believes it would not be in the best interest of the Corporation or its shareholders for such a suit to be commenced. However, Chase has instructed its counsel to continue monitoring developments relating to the complex Penn Square situation to ensure that the Chase rights are adequately protected and any claims are vigorously pursued.

(Carlson Aff. ¶ 18).

In connection with the pending motion, Chase has submitted the affidavit of its Vice President and Director of Litigation, Mr. Kent T. Stauffer. The Stauffer affidavit (pertinently) states:

Chase neither objects to nor supports this action's being brought on Chase's behalf by certain of Chase's shareholders. Chase takes a neutral position on Peat Marwick's motion and leaves it to the decision of the Court.

(Stauffer Aff. ¶ 3).

## II. *PMM's Motion to Dismiss on Demand Grounds*

■ PMM urges that this action be dismissed on two independent, alternative grounds. First, PMM argues that the complaint is dismissible on its face because it fails to satisfy the requirements of Rule 23.1. Plaintiffs admit that they made no demand upon Chase to sue PMM in connection with the Penn Square and Drysdale matters. The complaint alleges, however, that a demand would have been futile because Chase's board had previously rejected a demand by another stockholder that PMM be sued. PMM contends that that allegation is legally insufficient to excuse a demand because plaintiffs have not alleged that the Board's rejection of that demand was wrongful.

PMM also contends, in the alternative, that it is entitled to summary judgment on the basis of the Carlson Affidavit which establishes, by facts extrinsic to the complaint, that (i) as to the Drysdale situation, no Chase stockholder (including the plaintiff) has ever made a demand upon Chase's Board to cause Chase to sue PMM, and (ii) as to the Penn Square situation, Chase's Board determined, after investigation, that PMM should not be sued.

On its merits PMM's first demand-related argument is valid. The plaintiffs' position in their complaint is that because Chase's Board has previously rejected a prior demand by another shareholder that PMM be sued, a second such demand by plaintiffs would be futile. That argument is legally insufficient, because plaintiffs have not alleged (even in conclusory, let alone specific terms) that the Board's refusal of the prior demand was wrongful. *See Zapata Corp. v. Maldonado,* Del. Supr., 430 A.2d 779, 784 (1981); *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 813 (1984); *Allison v. General Motors Corporation,* 604 F.Supp. 1106, 1122 (D.Del.) *aff'd,* 782 F.2d 1026 (3d. Cir.1985). On that basis alone the complaint would be dismissible on its face, quite apart from PMM's motion for summary judgment.

## III. *Plaintiffs' Arguments in Avoidance of Dismissal*

The plaintiffs do not respond to PMM's demand-related arguments on their merits. Rather, by way of confession and avoidance, plaintiffs argue three separate rea-

sons why, despite their failure to make a demand, dismissal of the complaint would be unwarranted. First, plaintiffs contend that PMM lacks standing to raise the defense of failure to comply with Rule 23.1 —a defense which, they argue, is available only to Chase. Second, they insist that dismissal would be inappropriate because Chase now acquiesces in the maintenance of this derivative action. Third, plaintiffs argue that demand is excused because, by appointing the Litigation Committee to investigate potential claims against Chase's directors and officers, Chase's Board has implicitly conceded that a demand would be futile.

The plaintiffs' contentions are now addressed.

### A. The Plaintiffs' Standing Argument

■ The plaintiffs' standing argument presents the question of whether a defendant that is a stranger to the corporation on whose behalf the derivative suit is brought, has standing to raise the defense of failure to comply with the demand requirements of Chancery Court Rule 23.1. That issue is one of first impression in this Court. In support of their opposing contentions, both sides cite authorities from other jurisdictions reflecting divergent views on the subject. Having carefully considered the parties respective views, I am led to conclude that PMM's position—that a defendant other than the corporation on whose behalf the suit is brought may raise the defense of failure to satisfy the demand requirements of Chancery Court Rule 23.1—is the correct one and best fulfills the underlying policy and purpose of that Rule.

An appropriate starting point is the Rule 23.1 demand requirement itself, compliance with which is deemed to be an essential prerequisite to a shareholder's entitlement to sue derivatively on the corporation's behalf. The genealogy of Rule 23.1, which is traceable to the United States Supreme Court decision in *Hawes v. Oakland,* 104 U.S. (Otto) 450, 26 L.Ed. 827 (1882), confirms the centrality of the demand requirement in derivative actions. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 530–531, 104 S.Ct. 831, 835–36, 78 L.Ed.2d 645 (1984).

In *Hawes,* a shareholder sued derivatively on behalf of the Contra Costa Water Company to enjoin it from providing water to the City of Oakland free of charge. The corporation and its directors did not answer the complaint, but the City of Oakland filed a demurrer on the ground that the plaintiff had not demonstrated his capacity to sue on behalf of the corporation. The Supreme Court sustained the demurrer. Surveying both English as well as American precedent, the *Hawes* Court found that the derivative action had developed as an equitable device to enable shareholders to enforce a corporate right that the corporation had either failed or refused to assert on its own behalf. To avoid the potential abuses of such suits, the Supreme Court established certain requirements that a shareholder plaintiff would have to satisfy in order to proceed derivatively in the federal courts. *Hawes,* 104 U.S. at 460–461; *Daily Income Fund v. Fox,* 464 U.S. at 530–531, 104 S.Ct. at 835–36. Those requirements were later codified in, and carried forward into, successive revisions of what has become Fed. R.Civ.P. 23.1.[1] With certain exceptions not relevant here, Chancery Court Rule 23.1 is modeled after, and is virtually identical to, Federal Rule 23.1.

---

**1.** Shortly after its decision in *Hawes,* the United States Supreme Court adopted Equity Rule 94, which codified *Hawes.* In 1912, the Court replaced Rule 94 with Equity Rule 27, which added to the Rule 94 requirement that the plaintiff allege that a demand had been made upon the corporation's directors, the additional requirement that the plaintiff allege reasons for not making a demand. Equity Rule 27 codified the holding in *Delaware & Hudson Co. v. Albany & Susquehanna R. Co.,* 213 U.S. 435, 29 S.Ct. 540, 53 L.Ed. 862 (1909), that demand could be excused if it would be futile. When the Federal Rules were promulgated in 1937, Equity Rule 27 was substantially restated as Rule 23(b). In 1966, Federal Rule 23(b) was revised and carried forward to its present form as Rule 23.1. *See generally Daily Income Fund Inc. v. Fox,* 464 U.S. at 530–531 n. 5, 104 S.Ct. at 835 n. 5; 3B Moore's Federal Practice ¶ 23.1.01 (1987); Note, *The Demand and Standing Requirement In Stockholder Derivative Actions,* 44 U.Chi.L.Rev. 168, 171 n. 23 (1976).

The most topically significant of the *Hawes* requirements—a pre-lawsuit demand upon directors—was intended to implement the basic principle of corporate governance that decisions on behalf of a corporation (including a decision whether to commence litigation) are normally made by the corporation's board of directors. *Daily Income Fund Inc. v. Fox*, 464 U.S. at 531–533, 104 S.Ct. at 836–837; *Hawes*, 104 U.S. at 460–461. The *Hawes* court regarded compliance with the requirements that later became embodied in Fed.R.Civ.P. 23.1, as a *sine qua non* of a shareholder's right to sue derivatively. *See Hawes* 104 U.S. at 460–461. Those same requirements that were so central to *Hawes* and to Fed.R. Civ.P. 23.1 are equally fundamental to Delaware corporate jurisprudence and to Chancery Rule 23.1. The Delaware Supreme Court has recognized the critical importance of the demand requirement of Chancery Rule 23.1 to implementing the fundamental precept that a Delaware corporation's business and affairs are to be managed by its directors. *See Zapata Corp. v. Maldonado*, 430 A.2d at 782–784; *Aronson v. Lewis*, 473 A.2d at 812; 8 *Del.C.* § 141(a).

The foregoing discussion of the Rule 23.1 demand requirement bears directly on the question of who should have standing to challenge a plaintiff's failure to abide by that requirement. The plaintiffs argue that only the corporation should have standing to do so, because the demand requirement of Rule 23.1 was intended to implement a corporate governance principle that is of concern only to the corporation. Thus, plaintiffs argue, whether or not the suit is brought directly by the corporation or derivatively by one of its stockholders is not a proper concern of a defendant who is a stranger to the corporation. Therefore, the argument goes, an "outside" defendant ought not to be entitled to raise as a defense a plaintiff's failure to make or excuse demand.

That view is not without persuasive force. But the argument, nonetheless, remains flawed in two respects. First, it ignores the inherent interest that any defendant would have in being able to challenge a plaintiff's capacity to sue him—a concern reflected in Chancery Rule 9(a), which permits defendants (without distinctions) to challenge a plaintiff's capacity to sue. Second, plaintiffs' argument overlooks the critical importance—emphasized in *Hawes*, *Zapata*, and *Aronson*—of the policy underlying the demand requirement, *viz.*, that the decision as to whether and in what manner a corporation should pursue a corporate claim, is ordinarily for the board of directors to make. That policy is not furthered by a restrictive rule of standing that would prevent particular classes of defendants from raising a Rule 23.1 defense that, if meritorious, would place that litigation-related decision in the directors' hands. And especially where, as here, the directors have previously (but not wrongfully) decided that the corporation ought not to pursue a claim against an outside defendant, a stockholder should not be permitted to override that determination by invoking a standing principle that would preclude the outside defendant from relying defensively upon the board's determination.

To express it in different words, the policy underlying the requirement of a demand is best furthered by a broad, not a narrow, concept of standing to raise the defense of failure to comply with Rule 23.1. The opposite result argued for by plaintiffs would undercut the basic policy of the demand requirement as originally formulated in *Hawes* and as carried forth in Federal and Chancery Rules 23.1.[2] Thus, in a derivative action, a defendant other than the corporation should have standing to challenge the plaintiff stockholder's failure to comply with the demand requirement of Chancery Rule 23.1.

That result is in accord with the rule followed by the Third Circuit in *Shlensky*

**2.** Indeed, in *Hawes*, it was an unrelated "outside" defendant, (the City) that moved successfully to dismiss the shareholder's complaint. Although neither the corporation nor its directors had responded to the complaint, the Supreme Court held that the complaint was properly dismissible on the outside defendant's motion. *Hawes*, 104 U.S. at 451, 461–462.

*v. Dorsey*, 574 F.2d 131 (3d Cir.1978), where that court stated:

> For it is well settled, contrary to the plaintiffs' contention, that defendants other than the corporation whose rights the shareholder plaintiffs are seeking to vindicate may successfully raise the defense of failure to comply with Rule 23.1.

574 F.2d at 142 (citations omitted).[3]

The authorities cited by the plaintiffs do not persuade me of their contrary point of view. The plaintiffs rely in part upon New York decisions, *Ripley v. International Railways of Central America*, N.Y.App. Div., 8 A.D.2d 310, 188 N.Y.S.2d 62 (1959), *aff'd*, 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E.2d 443 (1960) and *Lazar v. Merchants' National Properties, Inc.*, N.Y.Sup.Ct., 45 Misc.2d 235, 256 N.Y.S.2d 514 (1964), 23 A.D.2d 630, *aff'd*, 256 N.Y.S.2d 542 (1965), and upon a federal case, *Markowitz v. Brody*, 90 F.R.D. 542 (S.D.N.Y.1981), decided under Section 36(b) of the Investment Company Act of 1940. None of those decisions directly supports the plaintiffs' argued-for rule of standing.

In *Ripley, supra*, the New York court questioned whether an outside defendant could raise as a defense the plaintiff's failure to make or excuse a demand. However, the *Ripley* court did not decide the standing question, because it found that "there was sufficient evidence to warrant an inference both of demand and futility of demand." 188 N.Y.S.2d at 72. In *Lazar, supra*, the court, citing *Ripley* and *Koral v. Savory, Inc.*, N.Y.Ct.App., 276 N.Y. 215, 11 N.E.2d 883 (1937),[4] noted that the standing of a defendant other than the corporation to raise the defense of failure to make a demand had been "seriously questioned." However, the *Lazar* court did not reach the standing question either, since it found that the complaint properly alleged that a demand had been made and wrongfully rejected by the directors. 256 N.Y.S.2d at 517.

Finally, in *Markowitz v. Brody, supra*, the court, citing *Lazar, supra*, did say, by way of dictum, that "Rule 23.1 should permit fiduciaries of a derivative corporation, but not strangers, to complain of the plaintiff's failure to make a demand." 90 F.R.D. at 561. Nonetheless, the court held that the moving defendants (the fund's principal underwriter and one of its investment advisors) had standing to challenge the plaintiff's failure to comply with the demand requirements of Federal Rule 23.1, on the basis that Section 36(b) was intended to benefit a fund's investment advisors as well as the fund itself. 90 F.R.D. at 562–563.[5] Thus, neither *Markowitz* nor the cit-

---

**3.** The federal decisions that *Shlensky* cites for this rule involve defendants other than the corporation raising the defense of noncompliance with Rule 23.1, but those decisions do not directly discuss the standing issue. *See Brody v. Chemical Bank*, 517 F.2d 932 (2d Cir.1975); *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139 (3d Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973); *Ash v. International Business Machines, Inc.*, 353 F.2d 491 (3d Cir. 1965), *cert. denied*, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); *Meyers v. Keeler*, 414 F.Supp. 935 (W.D.Okla.1976). *See also Weiss v. Temporary Investment Fund, Inc.*, 516 F.Supp. 665, 667 n. 4 (D.Del.1981) (citing *Shlensky, supra*), *aff'd*, 692 F.2d 928 (3d Cir.1982), *vacated on other grounds*, 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984); *Recchion v. Westinghouse Electrical Corp.*, 606 F.Supp. 889, 896 (W.D.Pa.1985) (same).

**4.** Both the *Ripley* and *Lazar* courts relied upon *Koral v. Savory, Inc., supra*, which involved a challenge to a stockholder's right to pursue a derivative action on behalf of a corporation in receivership, where the receiver had refused to institute the suit. The stockholder alleged that the receiver was a clerk in the office of the attorneys for the defendants and, as receiver, had sought to prevent an action by the corporation against his employer's clients. Based upon that allegation, the court allowed the stockholder to proceed derivatively with the suit, stating that the "[c]hoice [as to whether to permit the action to go forward where the receiver is disqualified] lies with the court. The alleged wrongdoers may not dictate how the choice should be exercised." 11 N.E.2d at 886. *Koral* does not, however, hold that the corporation alone has standing to raise the defense of failure to make or excuse a demand.

**5.** *Markowitz* has effectively been overruled, at least as to its Rule 23.1 holding, by the United States Supreme Court's decision in *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984), which holds that the demand requirements of Rule 23.1 do not apply in actions brought by a shareholder under Section 36(b) of the Investment Company Act of 1940.

ed New York cases directly supports the plaintiffs' argument that only the corporation may raise the defense of failure to make (or excuse) a demand.

Lastly, the plaintiffs rely upon a line of federal decisions under Section 16(b) of the Securities Exchange Act of 1934, which hold that a defendant who is sued for "short swing" profits in violation of that Act lacks standing to object to a plaintiff's failure to comply with the demand requirement of Section 16(b).[6] The Section 16(b) decisions, however, are not persuasive authority, because they involve a unique statutory policy that is not implicated in derivative actions brought under Chancery Rule 23.1.

Underlying Section 16(b) is a paramount Congressional policy of deterring statutory insiders from "short swing" trading in the corporation's securities and from profiting thereby. That that policy is of paramount concern is evidenced by several factors. Section 16(b) is a statute that, as a general matter, imposes liability without fault. *Foremost-McKesson Inc. v. Provident Securities Co.*, 423 U.S. 232, 251, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976). Once a transaction proscribed by that statute has occurred, liability is imposed without regard to whether the profiting insider actually used inside information or even intended to engage in short-term trading. *Prager v. Sylvestri*, 449 F.Supp. 425, 429 (S.D.N.Y.1978). Section 16(b) creates a right of action in the shareholder to sue on behalf of the issuing corporation. 15 *U.S.C.* § 78p(b). In contrast to the requirements of Rule 23.1, with which a shareholder must normally comply before being entitled to proceed in a derivative capacity, under Section 16(b) a plaintiff need only make a demand and wait sixty days before being entitled to institute suit if the corporation

has failed to do so. *See* 15 *U.S.C.* § 78p(b). And under Section 16(b), a shareholder may maintain a derivative suit to recover insider short-swing profits, despite the decision of the board of directors not to sue. *See Burks v. Lasker*, 441 U.S. 471, 484 n. 13, 99 S.Ct. 1831, 1840, 60 L.Ed.2d 404 (1979); *compare Zapata Corp. v. Maldonado*, Del. Supr., 430 A.2d 779 (1981). One court has suggested that the sixty day post-demand waiting period requirement may even be waived in appropriate circumstances. *See Morales v. Mylan Laboratories, Inc.*, 443 F.Supp. 778, 780 (W.D.Pa.1978).

All of the foregoing suggests that the restrictive standing rule followed in Section 16(b) cases does not reflect a policy generally applicable to all derivative actions, but, rather, should be viewed as limited in its application to Section 16(b) cases. Stated differently, the restrictive standing rule in derivative actions under Section 16(b) cases appears to reflect a judgment that the Congressional policy of deterring short swing profit-making by statutory "insiders" outweighs the policy of safeguarding the integrity of the corporation's internal governance process, and that that Congressional purpose is best achieved by restricting the categories of defendants who will be allowed to raise a defense that, if valid, would frustrate a Section 16(b) recovery.[7]

That supervening Congressional policy is not present in derivative actions brought under Chancery Rule 23.1. In such cases, as previously noted, the requirement that a shareholder make a demand or plead facts that would excuse a demand is a foundation of the shareholder's right to sue derivatively. The purpose of that requirement, to reiterate, is to enable the corporation's board of directors to determine whether the corporation should bring the action. *See Hawes*, 104 U.S. at 460–461; *Zapata Corp. v. Maldonado*, 430 A.2d at 782–784;

---

**6.** *See Colan v. Monumental Corp.*, 524 F.Supp. 1023, 1028 (N.D.Ill.1981); *Prager v. Sylvestri*, 449 F.Supp. 425, 429 (S.D.N.Y.1978); *Schur v. Salzman*, 365 F.Supp. 725, 732–33 & n. 30 (S.D.N.Y.1973); *Morales v. Mylan Laboratories, Inc.*, 443 F.Supp. 778, 779 (W.D.Pa.1978); *Benisch v. Cameron*, 81 F.Supp. 882, 885 (S.D.N.Y.1948); *Grossman v. Young*, 72 F.Supp. 375, 380 (S.D.N.Y.1947).

**7.** Because of the unique nature of the policy underlying Section 16(b), another requirement of Rule 23.1—the requirement that the plaintiff be a stockholder at the time of the transaction complained of—has been found inapplicable to derivative suits under that statute. *See Markowitz v. Brody*, 90 F.R.D. at 550–552, and cases discussed therein.

*Aronson v. Lewis*, 473 A.2d at 811–812. Accordingly, the considerations that motivate the standing rule applied in Section 16(b) cases ought not to govern in derivative actions brought pursuant to Chancery Rule 23.1.

For the foregoing reasons, PMM will be permitted to challenge, on Rule 23.1 demand grounds, the plaintiffs' authority to maintain this derivative action on behalf of Chase.

### B. *The Argument That Chase Has Acquiesced In The Derivative Action*

■ Plaintiffs' second argument is that Chase has not objected to their continuing to prosecute this derivative action, as evidenced by the Stauffer Affidavit which states that Chase "neither objects to nor supports" the action and "takes a neutral position on Peat Marwick's motion...." Relying primarily on *Sohland v. Baker*, Del.Supr., 141 A. 277 (1927), plaintiffs contend that even if they did fail to make a demand or to establish the wrongful rejection of a demand, they may still prosecute this derivative action because Chase's directors do not oppose it and have acquiesced in its continuation.

In *Sohland v. Baker, supra,* a stockholder of the Bankers' Mortgage Company sought the cancellation of stock that had been issued to one of its directors in a transaction in which a "great majority" of the directors had participated. The stockholder made a demand on the corporation's board to prosecute the claim. Although the board formally rejected the demand, on the same day the directors authorized the payment of a retainer to the stockholder's attorney, who subsequently filed the ac-

tion. One of the directors even escorted the stockholder to the attorney's office. *Sohland,* 141 A. at 281–282. On those facts the *Sohland* court permitted the stockholder to proceed with the derivative action.

*Sohland* involved a situation where the directors had decided against the maintenance of a lawsuit by the corporation, but by their conduct, affirmatively endorsed its maintenance by a stockholder suing derivatively.[8] This case, however, is not *Sohland.* Here, Chase's directors have neither objected to, nor have they supported, this action. Instead they have taken a neutral position with respect to PMM's motion. A posture of neutrality is not tantamount to Board authorization for plaintiffs to proceed derivatively on Chase's behalf.

*Sohland* may be viewed as authority for the proposition that it is permissible for directors, in response to a demand, to decide not to have the corporation bring the action, but instead to support a stockholder's derivative suit on the corporation's behalf. The essential ingredient in *Sohland* that is lacking here is the affirmative exercise of the directors' business judgment to support the derivative action. Indeed, the record does not even disclose that Chase's directors have ever reconsidered this matter after initially deciding not to sue PMM. It shows only that a corporate officer has filed an affidavit taking a position of neutrality on the corporation's behalf. That, in my view, is not sufficient to defeat PMM's motion to dismiss for failure to make or excuse a demand.[9] Accordingly, plaintiffs' argument that Chase has acquiesced in the prosecution of this derivative action must be rejected.

---

8. In *Zapata Corp. v. Maldonado, supra,* 430 A.2d at 783, the Delaware Supreme Court observed that although the board in *Sohland* had refused to bring suit on behalf of the corporation, they clearly supported the stockholder in his efforts. Plaintiffs also rely upon *Halprin v. Babbitt,* 303 F.2d 138 (1st Cir.1962) (decided under Massachusetts law). *Halprin,* like *Sohland,* was a situation where the directors clearly supported the suit. In *Halprin,* at the hearing on the individual defendants' motion to dismiss, plaintiff's counsel submitted an affidavit indicating that the corporation and its directors did not oppose the action and desired a determination on the merits. On that basis the First Circuit remanded for further proceedings, finding that "[t]here is a clear suggestion that after demand was made upon [the directors] they, like the stockholders, were content to have the plaintiffs be the one to proceed." 303 F.2d at 142. No such "clear suggestion" appears on the record in this case.

9. The importance of the requirement of an affirmative board decision is underscored where, as here, the Board has previously determined not to sue the moving defendant. If the plaintiffs' contention is that the Board has changed its mind (at least insofar as allowing these plaintiffs to sue on Chase's behalf), that proposition is not supported by the record.

## C. *The Argument That Chase's Board Has Conceded Its Disqualification To Consider Impartially a Demand*

█ Finally, plaintiffs argue that Chase's Board of Directors, by appointing a Special Litigation Committee to determine whether Chase should sue its officers or directors in connection with the Penn Square matter, implicitly conceded their disqualification to consider a demand to sue PMM in connection with the Drysdale and Penn Square matters. On that basis, and relying upon *Abbey v. Computer & Communications Technology Corp.*, Del.Ch., 457 A.2d 368 (1983), plaintiffs argue that demand is excused.

In *Abbey,* a shareholder made a demand on a corporation's board to bring an action to recover profits made from an allegedly illegal sale of the corporation's stock. The board referred the matter to a litigation committee, but before the committee was able to respond, the plaintiff instituted a derivative action. The corporation and the individual defendants moved to dismiss for failure to comply with Rule 23.1. This Court denied the motion, holding that the board, by referring the matter to the litigation committee, had waived its entitlement under *Zapata* to deal with the matter in the first instance and had thereby tacitly conceded that the action was one that a stockholder could maintain derivatively:

> Under these circumstances it seems reasonable to conclude that in the face of the allegations in the complaint concerning the prior demand the board was satisfied that the situation was one in which it should step aside and avail itself of the procedure authorized under *Zapata* in cases of board disqualification. Having thus, in effect, conceded its disqualification, and having thereby conceded the claimed right of the plaintiff to bring the suit without awaiting word from it, I do not feel that CCTC's board of directors can thereafter authorize corporate counsel to move to dismiss the derivative suit based on the contention that the plaintiff lacked the standing to initiate it.

457 A.2d at 374.

The "waiver" rationale for which *Abbey* stands is not available to the plaintiffs here. Although a Special Litigation Committee was created in this case, that Committee considered claims only against Chase's officers and directors, not against PMM. The demand relating to PMM was referred by the Board to senior management, which recommended to the audit committee of the Board that no action be brought against PMM. In these circumstances the Chase Board cannot be said to have conceded any disqualification on Chase's part to decide whether or not PMM should be sued.

## IV. *Conclusion*

To summarize: (a) the plaintiffs have failed to excuse their not having made a demand as required by Rule 23.1; (b) PMM has standing to object to the plaintiffs' failure to comply with Rule 23.1; (c) Chase's posture of neutrality with respect to this derivative action does not, in these circumstances, constitute acquiescence by its directors in its continuation; and (d) the referral of stockholder demands to a Special Litigation Committee did not operate as a concession by Chase's directors that demand was excused with respect to PMM.

For the foregoing reasons, PMM's motion to dismiss is granted.

IT IS SO ORDERED.